Thank you, Your Honor. Your Honor, as said, Dan Galperin for the appellants, I'd like to reserve three minutes for rebuttal. This cross appeal, Your Honors, is before you after the district court rejected DRA's motion for partial summary judgment as the liability. DRA is comprised of people who love the Deschutes and who utilize it in its riparian margins for recreational and professional purposes. They include for fishing, guiding, boating, and rafting, camping, birding, and biological investigations. They have documented a marked degradation of water quality with respect to a number of parameters, including pH, dissolved oxygen, and temperature, ever since defendants installed their selective water withdrawal tower nearly 12 years ago. Corresponding to that degradation, the quality of their experience on the river also has declined. Our opening and reply briefs go into considerable detail about the district court's clear errors of law and fact, but here I want to make two overarching points before turning to those details. The points concerned first, the mandatory nature of the state water quality standards and the standards, water quality standards in the certification and its water quality plan. And second, as the reported difference between those state approved standards and the certification standards. As to the first, state water quality standards are... I've got a problem with the threshold and that is, I'm not sure that I agree with the district court's conclusion about the sovereign immunity of the tribe. I have great trouble concluding that the Clean Water Act abrogates the tribe's sovereign immunity. And if that's so, we've got a rule 19 problem. Can you address the sovereign immunity question? Certainly, your honor. Well, actually, we strongly agree with the court's statutory interpretation. Yes, I think they do, but I'm inclined to think that that's a problem. Okay. And so, your honor, even if it were close, in our view, we think that even on policy grounds, the reading is to be favored, the district court's reading is to be favored. Don't we have to rule for the tribe under many doctrines of interpretation? I know, your honor. I think that the district court's citations of the several cases supporting the Clean Water Act's abrogation of tribal sovereign immunity are strong, and that the district court's review of the, in Judge Simon's view... Under the Indian canons of interpretation, I think that's what they're called. Sorry if I have the name of the canon slightly wrong, but I think we have to interpret ambiguity in the favor of the tribe, don't we? Yes, but the district court found, and we agreed, that the language of the Clean Water Act is clear, that it was a straightforward abrogation, stringing together the several provisions of the Clean Water Act. Okay. Here's my problem with the analysis, or maybe I'll say it this way. Here's why I'm inclined to agree with the tribe that their sovereign immunity has not been abrogated, and then you can respond to me and say, tell me where I'm wrong. The statute says that any citizen may commence a civil action against any person, and then it says, including the United States and any other government instrumentality agency to the extent permitted by the 11th Amendment. So I view that as waiving the sovereign immunity of the United States and preserving the sovereign immunity of the states, because it says, to the extent consistent with the 11th Amendment. We then move down to definition of person. The definition of person includes a state, and it includes a municipality. Municipality is then subdefined to include an Indian tribe. But the presence of the word state as one of the terms included within person gives me trouble for the following reason, we already know that the sovereign immunity of the state under the 11th Amendment is preserved, and now we're told that a state is a person, but I don't view the definition of person as abrogating the sovereign immunity that has already been protected above under the 11th Amendment, which means that the presence of the word state there means, well, the state is a person if the state, for example, is willing to waive its sovereign immunity, but I don't regard that definitional person provision as of its own force abrogating. And the only place you've got the Indian tribe is it's a municipality that comes under that same list. How do you respond to that? Well, you're correct, Your Honor, but nonetheless, we think that the Congress acted in this way and stringed together, as Judge Simon would say, the various provisions in an algebraic manner. That is the consequences of the language. Let me focus you very precisely on the question. Do you regard the word state as one of the entities that is a person as abrogating the sovereign immunity of the state? Yes, Your Honor. So that means that we are supposed to ignore the fact that the 11th Amendment immunity is preserved in an earlier provision of the statute? No, Your Honor. I mean, I think it's... Your Honor, actually, I didn't track that last argument. Could you say that again? Okay. Let me do it by statute numbers. 1365A says any citizen may commence a civil action against any person, including the United States, or here I'm going to paraphrase, or a state to the extent permitted by the 11th Amendment. That addresses sovereign immunity. It waives the sovereign immunity of the United States, and it specifically says that the 11th Amendment sovereign immunity is preserved. Then I move down to person, and person is defined as including a state. Well, I've just read 1365A, which says that the state has sovereign immunity under the 11th Amendment, and when I get down to 1362.5 that says a state is a person, I don't read 1362.5 naming the state as a person as going back on what I just read you from 1365A, which says that the 11th Amendment protects the state. That's my reading of the intersection of those two provisions with respect to the state. Do you disagree with me with respect to the state? No, Your Honor. I actually would simply ask to brief your question a little bit more because I haven't fully thought it through, but I nonetheless think that stringing the terms together does aggregate the immunity of the tribe, and I need to think a little bit more about the state. Yeah. Well, I mean, I don't need any more briefing. We've been, you've been over this in the district court, and you've been over this here. Yeah, yeah, yeah. Well, you've had your chance. Certainly, Your Honor, but we stand by the briefing that we included on this point in our reply.  Okay. But it sounds as though, at the least as of the moment, you don't have an argument that tells me that the inclusion of the state within the definite person is an abrogation of the sovereign immunity of the state that seems to have been preserved in 1365A under the 11th Amendment. Oh, Your Honor, but I would say this, that if that argument were to hold, then that would provide an incentive for any company, for example, not saying it occurred here, to align in a project, be a tribe, and then enforcement under the Clean Water Act would be essentially impossible because of the tribe's sovereign immunity. But this gets back to the canons. I mean, if Congress wants to abrogate tribal immunity, it can, but it has to do it very clearly. So you could make that argument to Congress and say the Clean Water Act needs to abrogate tribal immunity. But at this point, I don't see how we can be sure that we're not abrogating tribal immunity in the clean water. Yeah. Well, Gagnon, Your Honor, we agree with the way in which Judge Simon strung those provisions together. Okay. Okay. May I proceed with respect to the other arguments that I was going to provide? Oh, of course. Thank you, Your Honor. So first, as to the mandatory nature of the state water quality standards and the certification, state water quality standards are established to secure the biological integrity of the waterways, including their downstream communities under section 401 of the Clean Water Act. State agencies here at the department must certify whether a proposed project requiring federal licensing has sufficient terms and conditions to ensure that applicable water quality requirements will not be violated. Oregon's state water quality standards, as we discussed in our briefs, contain both numeric and narrative criteria. The numeric criteria provide a floor for the stringency of permanent certification protections. In the present context, the terms and conditions of the project certification and water quality plan can be more protective, but they may not be less. That is, they cannot permit a level of water quality degradation that would violate minimum state water quality standards. In the certification at issue here, that feature is ensured by condition S, and that's at ER 253. The water quality standards also contain strong narrative requirements, including as discussed in our briefs, that for a facility or a project, the highest and best practicable control of activities and flows must in every case be provided so as to maintain dissolved oxygen and overall water quality at the highest possible levels and water temperatures and other deleterious factors at the lowest possible levels. So how, though, to reconcile where, as in the present project, the operations of its facilities here, the tower and the re-regulation dam 10 miles downstream, may impact water quality parameters in different directions. Here, with respect to the tower alone, there is some tension that is between the goal of ensuring the lowest possible temperature and the highest possible dissolved oxygen in project discharge, but it is not a conflict in the main as to actual compliance with water quality criteria requirements. This is where the water quality plan compels operator reflection on adaptive management considerations. All that adaptive management requires is that operators consider all likely impacts, that is the temperature, dissolved oxygen, pH, nuisance phytoplankton and downstream fish passage before changing the blend of surface to bottom waters that get discharged through the tower and then eventually 10 miles downstream through or over the re-regulation dam. But except for those relatively rare occasions where there are both pH or temperature violations and defendants were already spilling maximum water over the downstream re-regulation dam, that is, except where the operators were doing all that they could, adaptive management considerations with respect to the tower could not and does not relieve liability for project violations. And as for fish passage, even during the three peak fish passage months of March 15 through June 15, none of the water quality violations can be justified on that account since at all times during those periods of time, those violations, of those violations, it was still ample additional bottom water to be released through the selective water withdrawal tower. Moreover, there's no showing on the record that 100% surface water withdrawal is needed to maintain adequate currents for fish passage, even during maximum smolt migration. And even if there were, that could only sanction a very small share of the 482 pH violations and 540 temperature violations that DRA delineated at ER 189 and 213. Accordingly, the so-called adaptive management consideration requirement can excuse few, if any, pH and temperature exceedances, and it excuses no dissolved oxygen violations where those are capable of elimination by additional spill over the re-reg dam. In this context, then, the water quality mandates of the 401-CERT and its water quality plan make sense and simply do not conflict with adaptive management considerations. So as to those requirements, the temperature management plan restricts the project from warming the water discharged into the lower deschutes by more than 0.25 degrees Fahrenheit. That limitation must be satisfied whenever background temperature meets the minimum level, that's at ER at 162. Similarly, the dissolved oxygen management plan states that the year-round Salmonid spawning standard of at least nine milligrams per liter must be maintained and year-round. Same with pH, the pH criterion within a range of 6.5 to 8.5 standard units, it expressly applies to the lower river and the requirement not to, and so it's requirement not to exceed 8.5 standard units must be met, that's at ER at 170. There is, however, one exception, and that is for instances, and I quote, where all practical measures are being employed to minimize exceedance. The district court thought that the exception justified it reading away the rule against pH violations, and PGE actually doubles down in its brief here. But that sole exception applies only to the project reservoirs that is the impoundments, and not at all as the district court mistakenly believed to the lower Deschutes River. And as to the mandate in the certification itself, there is condition S, that's at ER at 253. The district court's effort only reading of the cert and the water quality plan really flatly conflicts with condition S. That condition requires clearly that not withstanding the defendant's attempted compliance with any other certification conditions, and I quote, no waste shall be discharged and no activities shall be conducted, which will violate state water quality standards, that's at ER at 253. So its language is clear, there's nothing remarkable about the notwithstanding phrasing, this court's been down that road before us as the Supreme Court and several of the circuits. So the numeric water quality parameter limitations contained in the certification and its water quality plan were not precatory, they were not targets, instead they were and are requirements and DRA was entitled to enforce them, including those incorporated by reference from the state water quality standards. Turning now to the so-called interim agreements between the department and PGE. You know, you're down to about three minutes, so do you want to save some time at this point? Yes, Your Honor, I'll reserve. Okay, let's hear from the other side and then you've saved three minutes. Thank you. I'm not sure which of you wishes to go first. Your Honor, I'm going to go first. So Mr. Newton, it's yours. Thank you, Your Honor. And may it please the court, my name is Josh Newton. I represent the Confederated Tribes of the Warm Springs Reservation of Oregon, a federally recognized sovereign Indian tribe and a Columbia River Treaty tribe. My argument will focus on whether Congress abrogated tribal sovereign immunity for purposes of clean water accidents. The tribe and its members are a salmon people for whom their treaty reserve right to take fish and have fish to take is essential to their existence. It's difficult to imagine the subject of an action that more squarely implicates those ancient sovereign interests than this suit arising out of the operation of a hydroelectric project jointly owned by an Indian tribe that is located partially within an Indian reservation on a river that contains an important treaty protected tribal fishery that was extirpated from the upper basin during the first 50 year license. Mr. Newton, may I interrupt you for a second? Would you please address Mr. Galperin's observation that that any private organization such as PG&E could avoid any citizen suit simply by selling one percent of the interest in the dam to a tribe? I'd be happy to answer that, Your Honor. For a bit of context, this is not that case. This project is located partially within the Warm Springs Reservation, which was established by a treaty in 1855, mid 19th century. The tribe has treaty rights to exclude non-member from the reservation, and the tribe shouldered the burden of having the Pelton Round Deer hydroelectric project licensed and constructed on its lands beginning in 1950. The tribe and PG&E did not get along for that first 50 year license. And as the license came up for renewal, the party set aside their differences and decided to come together and put together a project that would work for both of their interests. I suppose it's possible, Your Honor, that non-tribal businesses could go out and seek to enter into business relationships with tribes to take advantage of tribal sovereign immunity. But I suspect that maybe that's something that when you read the amicus brief from NCAI and the limited economic development opportunities the tribes have because they don't have tax opportunities and they really look at their economic development as an aspect of their sovereignty, that that might be something the tribes do. But that's not this case. This case is about a project that is on the Warm Springs Reservation, an area reserved by treaty. It's equally about the need to ensure that the fish passage plan that was included in the PERC license has a chance at success. And that's what the tribe and PG&E are focused on. With respect, the district heard in concluding that Congress abrogated tribal sovereign immunity for purposes of citizen suits. There's simply no clear evidence that Congress considered tribal sovereign immunity, much less unequivocally chose to abrogate that immunity. It cannot be said with perfect confidence, as must be the case, that Congress meant to abrogate tribal sovereign immunity for such suits. The question presented is whether the congressional choice not to include Indian tribes in the list of sovereigns in the text of the citizen suit statute itself, but rather to horn those Indian tribes into the statutory definition of municipality, which is in turn included in the definition of person, is clear evidence that Congress both specifically considered tribal sovereign immunity and should abrogate that immunity for purposes of the Clean Water Act citizen suits. In our view, the answer to both questions is no. Tribal immunity remains intact, making compulsory joiner of an Indian tribe not feasible, because the tribe is both courts should remain this appeal for dismissal. I'm turning to the to the court. Do you think we should deal with our court's decision and Miller? Your court's decision that your honor the court's decision and Miller and our view is really just is really not controlling because it merely pointed to the Atlantic States case is an example of what it could be an abrogation of tribal sovereign The subject matter of Miller doesn't deal with the Clean Water Act. And it really does not take on the legal standard announced by this court in Daniel versus National Park Service. Is your argument that that passage in Miller is not reasoned dicta? It's definitely dicta, but we are bound by reasoned dicta in our court. So what do we do? Do we call that unreasoned dicta? That would be our position, Your Honor, we would call that unreasoned dicta, principally because if you read Atlantic States, Atlantic States never pauses to ask, did Congress consider tribal sovereign immunity? And if so, did it unequivocally choose to abrogate sovereignty? What Atlantic States did, and that was 1993, which is an old case, and it predates, in our view, really the Supreme Court's decision in Michigan versus Bay Mills Indian community, which really, I don't want to say change the standard for tribal sovereign immunity, but really restated it in a way that put it, put the level of rigor when addressing these questions at a higher level, maybe, or a sharper focus than a court in 1993 would have been thinking about. So in our view, Miller really didn't go back and look at Atlantic States and ask itself, in light of Michigan versus Bay Mills, in light of the fact that Sussman versus Texas, which have developed state sovereignty, but the court can look to for guidance, can we be sure that through mistake or inadvertence, Congress truly chose to abrogate tribal sovereign immunity for purposes of the Clean Water Act in 1972? And our belief is, had the Miller Court done so, the Miller Court would have concluded that, in fact, even though the Clean Water Act wasn't before it, it could not rely on Atlantic States for that purpose. Because when you go through the analysis that Judge Fletcher raised, which we think is the right analysis, we view this as concentric circles. You really look at the text of the disputed provision itself, which you got to start with the text of the citizenship statute. It says you can sue any person. Typically, persons don't include sovereigns. But Congress then goes and deals with two of the four constitutionally recognized sovereigns in the very parenthetical following word, person. Clearly deals with the United States, and it's dealing with the states to the extent of their 11th Amendment immunity. Judge Fletcher, we agree, it's difficult to understand what Congress was intending with respect to the states. But what is clear is that it was aware states had sovereign immunity, and it was grappling with it in some fashion. Actually, I don't think it's very difficult to understand at all what it was doing with the states. It said the sovereign immunity of the states under the 11th Amendment is preserved. And then it names later that the state can be a person. But of course, that's consistent with the 11th Amendment immunity, because a state can waive its sovereign immunity if it wishes to do so. I think that's right, Harold. I think that's right. And from our perspective, though, by not mentioning Indian tribes, which is the most natural place to address a sovereign in the list with its sister sovereigns, our view is that you cannot have clear and unmistakable evidence that Congress was considering tribal sovereignty or sovereign immunity when it adopted the Citizenship Provision in 1917. For that reason, we believe that the district court erred. Judge Friedland, I wanted to touch on your question about, you know, doesn't close tip in favor of sovereign immunity? And the answer is it absolutely does, not just in favor of tribal sovereignty, but questions of when Congress is waiving the United States' sovereignty, questions about when Congress is waiving states' sovereignty. It's not just a canon of construction when involved in Indian tribes. It is a canon of construction that applies when dealing with this abrogation of the waiver of sovereignty. Well, you have both here, right? Because you also have a canon that we interpret ambiguity in states and tribes. That is correct. That is correct. For some reason, my lights went out. Move along. So the morning of technical, oh, now they're back, technical difficulties. One point, one part I wanted to point out, Your Honors, is in the Daniel v. National Park Service case, 891 F. 3rd, 762, I'm really looking at 769. You know, what's the purpose of this clear textual waiver? This notion that you want to ensure as a judiciary that Congress specifically considers sovereign immunity and that it intentionally legislates on that. The reason for that, according to the court in Daniel, is it ensures that Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation. We would suggest, Your Honors, that a construction of the citizenship statute as an abrogation of tribal sovereign immunity really risks ratifying something that looks like it was an oversight by Congress. There's simply no evidence in the text of the statute that suggests that Congress was aware of tribal sovereign immunity and that it chose to abrogate it. I'd just like to conclude, Your Honor, with a brief bit of the resource issue, and then I'll turn it over to my colleague, Mr. Stateland, and to say that the tribe does not want this panel to leave this argument today thinking that the ecological function of the river during the first license period somehow did not violate water quality standards and did not impose a substantial environmental burden on the tribe and its treaty fishery resources. The last dam was built in the 60s, and by the early 1970s, the treaty fishery above the project was extirpated. After the installation of the Selective Water Withdrawal Tower, there are now fish passing through the project, and that is critically important to my client. Thank you. Mr. I'm going to try to pronounce your name. Stateland, is that how I pronounce it? That's correct, Your Honor. That's right on. Okay. Mr. Stateland, to you. Thank you, Your Honors. Amish Stateland for Portland General. I had intended to focus my remarks today on Article III standing with regard to reversibility and if the court reaches the merits. Now, I observe that Your Honor's questions have mostly been focused on tribal immunity. We join entirely the argument that Mr. Newton made, and the only thing that I would add is with regard to Judge Bea's concern. If there was some sort of case that there was a de minimis connection to a tribe or it was some sort of arguable sham, that could be dealt with under the Rule 19 factors. There is no argument here that the tribe isn't core sovereignly interested in this project, which abuts it, which is part of its reservation, which has fish passage, which is so core to the very essence of the tribe. Now, if Your Honors have no further questions on tribal immunity, I will talk a little bit about Article III standing and redressability. And in order to discuss this, I think I need to set a little bit of context. This is not a standard Clean Water Act permitting case where you have a wastewater discharge permit that if there's a finding of a violation, then the court just orders to discharge less. Here we have a certification for the complex management of a complicated watershed where it is undisputed that the core techniques in the certification for reducing some exceedances are necessarily in tension with the necessary control of other exceedances. In particular, the core operation of the certification criteria here involve use of the selective water withdrawal facility to draw more or less bottom water as part of the blend of what's discharged down the project. Now, I don't understand why this means there's no standing. It seems like you're saying like the perfect is the enemy of the good or something. I mean, couldn't they get some relief, even if they couldn't perfectly get you to comply with all of the standards because the two are in tension with each other? Your Honor, in order to satisfy redressability, they would have to show how we could adaptively manage the project better. They have set out a bunch of declarations talking about how they value the river. They value fishing there. They value looking around there. Of course, that's what the Oregon DEQ is concerned about. That's what the tribe is concerned about. That's what Portland General is concerned about. And we think we are managing this project in this complicated situation to the best manner practicable, unless they can show. But with respect to an Article 3 standing, basically what they're saying is there's too much hot water coming down, and that's clearly redressable by taking more water out of the bottom rather than off at the top. So quite aside from the merits of their argument, if they were to take more water out of the bottom of the lake and send that down, that would take care of the problem, or at least it would ameliorate the problem. So I don't see that this is an Article 3 issue. Well, let me take one more shot at that, and then I will move on to the merits. The issue is if you take, and it's undisputed in the record, if you take more water from the bottom at the beginning of the year, what you're going to have, one, is you're going to have a lower dissolved oxygen, which hurts them just as much, but also, and critically, and they never respond to this, you will have less cold water to draw on at the end of the year because you'll be pulling all the water at the beginning of the year. So they're going to they have made no showing that pulling more water from the bottom near the beginning of the year will lead to a less overall exceedances. So as far as the record here, it is undisputed that they have not showed that they would suffer any less of the harms that they complain about if the withdrawal is made more at the beginning of the year. But that might mean you win on the merits. I'm still having trouble understanding how it prevents them from having standing. I mean, you're basically saying we have to do this balance between all these factors over the course of the year. We think we're doing it perfectly. They think you're not doing it perfectly and want it to be slightly different balance, I guess. Why can't that be something that they can pursue, even if you think that they should lose it? Certainly, if that had been this has been just the pleading stage and they alleged in their complaint that more bottom withdrawal would be better for them, they could survive at the pleading stage. But we're now at the summary judgment stage. And they've put forward no evidence that more bottom withdrawal at the beginning of the year will reduce overall exceedances. But I definitely understand your honor's skepticism. So if I may move on to the merits. Should I ask you whether if we agree with you on tribal sovereignty, we have to reach standing first? Uh, we don't think the precedent of this court is entirely clear, but we do think that the weight of authority is that standing needs to go before Rule 19, but there isn't a square non-abrogated holding of this court directly on point. So we can submit some more briefing if you want on that. We do think that the better reading of the case law is that you do have to address Article three standing first, however. What is the case that you rely on most for that proposition? So Wilbur versus Locke, which was abrogated on other grounds for 23 after one one oh one seems to suggest that Article three standing used to be decided before Rule 19, but it was abrogated on other grounds. So but moving moving on to the merits, there are two competing theories of the merits here before the court. Our view and what the district court adopted is that the project needs to be adaptively managed to reduce overall exceedances. Well, my friends in the other side have argued is that the project needs to avoid all exceedances on every single day. Now, that is what they had argued throughout this entire case until their reply brief, where they say on page 40 of their reply brief, and I quote, admittedly, the installation of the selective water facility was not expected to result in immediate and complete compliance with every water quality parameter. Now they go on in that same paragraph to say, well, later it was supposed to meet it. But I think that concession on page 40 must end their case with regard to the understanding of what the cert means, because if they are now conceding that there could be exceedances for some unspecified period of time after the installation of the selective withdrawal facility, then they're reading that there can never be any exceedances on any particular day must be wrong. And of course, the concession here on page 40 is, of course, correct. Under the text, the certifications text, the actual certification says over and over again that what is the plan for the water major? It says that the parties can identify those measures that the tribe and PG will undertake to reduce the project's contribution to exceedance. And then you have other textual indications throughout both the certification itself and the water management plan that talk about what to do with exceedances. There has to be a requirement. There's a requirement to monitor to determine how many exceedances there are. There's even requirements to say if there are exceedances, but all feasible measures are taken, continue to operate the project. There are other requirements to say if there are exceedances in a certain way. Well, the way that you deal with that is you contact DEQ. So that's the text. And then there's also the context and the party's performance, the parties and the parties mutual understanding. Here, the parties to the certification are the DEQ, the tribe and Portland General. They all share and they have expressed throughout this case including DEQ in its in its declaration for this report, the same understanding of the certification, which is to adaptively manage the project to reduce overall exceedances. And then with regard to the court's performance, of course, there has been performance over many years. There have been the interim agreements, and those show that none of the parties, including the court performance, ever thought that this certification acquired no exceedances on any particular day. Unless the court has any further questions, I'm happy to cede the remainder of my time. OK, no further questions from the bench. OK, thank thank thank you very much. Mr. Galperin, you've saved some time. You're muted. Sorry about that. There we go. First, Your Honor, as to the so-called interim agreements, it's simply not true that they delineated water quality limits that were more stringent than those that were approved by under state water quality standards. The court simply got this reversed. And so even if there was compliance with the so-called interim agreements, that would not satisfy the requirement that they not violate state water quality standards. Now, with respect to the bottom water issue, I think there's simply no question that additional release of bottom water would limit both temperature violations and pH violations. Now, my colleague on the other side notes that there's no showing in the record that the project wouldn't run out of bottom water if it were released earlier to actually limit those exceedances. But actually, there's no showing in the record that bottom water would run out at all. The record is noticeable by no such evidence. And then turning to standing, the record simply does not establish that it's impossible for the project to be operated in compliance with all of its water quality parameters and the fish passage requirement. DRA actually did not concede any point with respect to this question. And DRA's own decorant with 30 years of experience as a water quality manager for the department stated that simultaneous compliance with the certification's water quality requirements could be met without compromising the collection of downstream migrating smolts. So there's at least a factual issue in dispute there. And then finally, because I see I have only a few seconds left, while our argument, I think, is extensive with respect to the statutory construction question and sovereign immunity, in addition, I'll simply point out to the court, that DRA made an additional argument. And that is that in equity and good conscience, the case should otherwise be allowed to proceed because the tribe, in fact, was not an indispensable party. It was adequately represented by PGE. And in good conscience and in equity, the case actually could have been deemed to be allowed to move forward even if the tribe enjoyed sovereign immunity under the Clean Water Act. Thank you. Okay. Thank you very much. Thank all parties for their useful arguments. The Chute River Alliance versus Portland General Electric and Confederated Tribes of the Warm Springs Reservation of Oregon now submitted for decision. And that completes our argument for this morning and indeed for the week. Thank you very much. Thank you, Your Honor.
judges: W. Fletcher, Bea, Friedland